## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## JASPER DIVISION

| | | |
|---|---|---|
| **STEPHEN PHILLIP CHANCY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No.  6:16-cv-00735-JEO** |
| | ) | |
| **NANCY BERRYHILL, Acting** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

Plaintiff Stephen Phillip Chancy brings this action pursuant to 28 U.S.C. § 405(g), seeking review of the final decision of the Acting Commissioner of the Social Security Administration denying his application for Disability Insurance Benefits ("DIB").  The case has been assigned to the court per the general order of reference of this district.  After thorough review, the court finds the Commissioner's decision is due to be remanded.

## I.    PROCEDURAL HISTORY

On September 10, 2013, Chancy filed an application for DIB with the Social Security Administration.  (R. 12).[1]  The Regional Commissioner denied his claim on January 9, 2014. (*Id.*)  Chancy filed a Request for Hearing with an Administrative

---

[1]References herein to "R. ___" are to the electronic record located at document 8.

Law Judge ("ALJ") on February 18, 2014. (*Id.*) On September 3, 2014, ALJ Cynthia

G. Weaver conducted a hearing, which Chancy, his attorney, and a vocational expert

("VE") attended. (*Id.*) The ALJ issued a decision denying Chancy's DIB claim on

November 14, 2014. (R. 12-21).

Chancy requested the Appeals Council review the ALJ's decision. The

Appeals Council denied Chancy's request for review on March 26, 2016. (R. 1-4).

On that date, the ALJ's decision became the final decision of the Commissioner.

Chancy then filed this action for judicial review under 42 U.S.C. § 405(g) on May 5,

2016.

## II. STANDARD OF REVIEW

The court's review of the Commissioner's decision is narrowly tailored. The

court must determine whether the Commissioner's decision is supported by

substantial evidence and whether the Commissioner applied the proper legal

standards. *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002). The court must

"scrutinize the record as a whole to determine if the decision reached is reasonable

and supported by substantial evidence." *Bloodsworth v. Heckler*, 703 F.2d 1233,

1239 (11th Cir. 1983). "Substantial evidence is more than a scintilla, but less than

a preponderance." *Id.* It means the decision is supported by "relevant evidence a

reasonable mind might accept as adequate to support a conclusion." *Richardson v.*

*Perales*, 402 U.S. 389, 401 (1971).

Applying the foregoing standard, the court must defer to the ALJ's factual findings. *See Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991). The court may not "decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner." *Mitchell v. Comm'r of Soc. Sec.*, 771 F.3d 780, 782 (11th Cir. 2014) (citing *Winchel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011)). In contrast, the court reviews questions of law de novo. *See Cornelius*, 936 F.2d at 1145. Accordingly, no presumption of validity attaches to the ALJ's conclusions of law. *Wiggins v. Schweiker*, 679 F.2d 1387, 1389 (11th Cir. 1982). If the court finds the ALJ improperly applied the law, or failed to provide the court with sufficient reasoning for determining that the proper legal analysis has been conducted, the court must reverse the ALJ's decision. *See Cornelius*, 936 F.2d at 1145-46.

## III.  STATUTORY FRAMEWORK

To qualify for disability benefits, a claimant must show he or she is disabled. Being disabled is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 416(i).

A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). The plaintiff bears the burden of proving that he or she is disabled and is responsible for producing evidence in support of such a claim. *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003).

Determination of disability under the Social Security Act requires a five step analysis. 20 C.F.R. § 404.1520(a). Specifically, the Commissioner must determine in sequence whether the claimant: "(1) is unable to engage in substantial gainful activity; (2) has a severe medically determinable physical or mental impairment; (3) has such an impairment that meets or equals a Listing and meets the duration requirements; (4) can perform his past relevant work, in light of his residual functional capacity; and (5) can make an adjustment to other work, in light of his residual functional capacity, age, education, and work experience." *Evans v. Comm'r of Soc. Sec.*, 551 F. App'x 521, 524 (11th Cir. 2014)[2] (citing 20 C.F.R. § 404.1520(a)(4)). "Once a finding is made that a claimant cannot return to prior work the burden shifts to the [Commissioner] to show other work the claimant can do."

---

[2]Unpublished opinions of the Eleventh Circuit Court of Appeals are not considered binding precedent; however, the may be cited as persuasive authority. 11th Cir. R. 36-2.

*Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995) (citation omitted). The Commissioner must further show that such work exists in the national economy in significant numbers. *Id.*; *Evans*, 551 F. App'x at 524.

## IV.    FINDINGS OF THE ALJ

Chancy was 52 years old at the time of the final decision by the Commissioner. (R. 12, 21, 110). He has a high school education and past relevant work as a furniture delivery driver, delivery route driver, and truck driver. (R. 19, 50, 157). He was injured in an on-the-job 18-wheeler accident on January 2, 2012. (R. 290). He required helicopter transportation to Huntsville Hospital because of trauma. He sustained a T11-12 compression fracture as a consequence of the accident. (R. 293).

Following the administrative hearing, the ALJ determined Chancy met the insured status requirements of the Act through December 31, 2016, and had not engaged in substantial gainful activity since his alleged disability onset date of January 3, 2012. (R. 14). The ALJ further found Chancy had a severe history of thoracic spine fracture, status post ACDF at C5-6, status post left shoulder arthroscopy, degenerative disk disease ("DDD"), degenerative joint disease ("DJD"), and osteoarthritis. (*Id.*) The ALJ then found that Chancy did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in the regulations for presumptive disability. (R. 14-15). The ALJ determined

that Chancy had the residual functional capacity ("RFC") to perform light work, except that he can occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs; can never climb ropes, ladders, or scaffolds; can occasionally perform overhead reaching with the right upper extremity, but no overhead reaching with the left upper extremity; and should avoid extreme hot and cold temperatures, wetness, humidity, vibration, and unprotected heights. (R. 15-19).

The ALJ next found that Chancy's RFC precluded him from performing his past relevant work. (R. 19-20). The ALJ found, based on the vocational expert's ("VE") testimony, that Chancy's RFC did not preclude him from performing other work that exists in significant numbers in the national economy, considering his age, education, work experience, and RFC. (R. 20-21). The ALJ concluded that Chancy was not disabled under the Social Security Act. (R. 21).

## V.    DISCUSSION

The parties agree that the primary issue is whether substantial evidence of record and application of proper legal standards supports the Commissioner's final decision that Chancy was not disabled. (*See* Doc. 17 at 31 & Doc. 18 1-2). Chancy argues that the ALJ's finding that he has the RFC to perform light work is not supported by substantial evidence and that the correct legal standards were not applied. (Doc. 17 at 32). In support of this position, his counsel raises three specific

challenges:

> (1) The ALJ failed to properly evaluate the opinions and conclusions of his treating physician, Jerry V. Mosley, M.D.;

> (2) The ALJ failed to properly evaluate Chancy's credibility regarding the intensity, persistence, and limiting effects of his symptoms; and

> (3) The ALJ failed to provide Chancy with a fair, unbiased hearing.

(Doc. 17 at 32-57; Doc. 18 at 2). Each will be addressed below.

### A.    Dr. Mosley

### 1.    The Claims and the Standard of Review

Chancy's initial argument is that the ALJ did not accord proper weight to the opinions and conclusions of his treating physician, Dr. Mosley. (Doc. 17 at 32-44). Specifically, Chancy asserts that the ALJ (1) did not accord proper weight to Dr. Mosley's "extensive involvement" with Chancy as a treating physician (*id*. at 34); (2) failed to appreciate that the other evidence in the record supports Dr. Mosley's opinions (*id*. at 36); and (3) failed to recognize that Dr. Mosley's opinions were not conclusory or inconsistent with his records (*id*.). The Commissioner responds that the ALJ properly weighed Dr. Mosley's testimony. (Doc. 18 at 6-8).

In assessing the weight to be given a treating physician's testimony, the standard is clear:

A treating physician's testimony is entitled to "substantial or

considerable weight unless 'good cause' is shown to the contrary."
*Crawford v. Commissioner of Social Security*, 363 F.3d 1155, 1159
(11th Cir. 2004) (quoting *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th
Cir. 1997)) (internal quotations omitted). The weight to be afforded a
medical opinion regarding the nature and severity of a claimant's
impairments depends, among other things, upon the examining and
treating relationship the medical source had with the claimant, the
evidence the medical source presents to support the opinion, how
consistent the opinion is with the record as a whole, and the specialty of
the medical source. *See* 20 C.F.R. §§ 404.1527(d), 416.927(d).
Furthermore, "good cause" exists for an ALJ not to give a treating
physician's opinion substantial weight when the: "(1) treating
physician's opinion was not bolstered by the evidence; (2) evidence
supported a contrary finding; or (3) treating physician's opinion was
conclusory or inconsistent with the doctor's own medical records."
*Phillips v. Barnhart*, 357 F.3d 1232, 1241 (11th Cir. 2004) (citing
*Lewis*, 125 F.3d at 1440); *see also Edwards v. Sullivan*, 937 F.2d 580,
583-84 (11th Cir. 1991) (holding that "good cause" existed where the
opinion was contradicted by other notations in the physician's own
record).

The court must also be aware that opinions such as whether a claimant
is disabled, the claimant's residual functional capacity, and the
application of vocational factors "are not medical opinions, ... but are,
instead, opinions on issues reserved to the Commissioner because they
are administrative findings that are dispositive of a case; i.e., that would
direct the determination or decision of disability." 20 C.F.R. §§
404.1527(e), 416.927(d). The court is interested in the doctors'
evaluations of the claimant's "condition and the medical consequences
thereof, not their opinions of the legal consequences of his [or her]
condition." *Lewis*, 125 F.3d at 1440. Such statements by a physician
are relevant to the ALJ's findings, but they are not determinative, as it
is the ALJ who bears the responsibility for assessing a claimant's
residual functional capacity. *See, e.g.*, 20 C.F.R. § 404.1546(c).

*Cagle v. Comm'r. Soc. Sec.*, 2015 WL 5719180, *3 (N.D. Ala. Sept. 30, 2015).

## 2. Background

The ALJ's opinion in this case includes an extensive review of Chancy's

medical records and other evidence. It provides:

> The claimant alleges disability due to injuries sustained in an accident on January 3, 2012; however hospital records show the entire workup at the time of the accident was negative for more than a chest wall contusion and Tl 1-12 compression fracture which was demonstrated on an MRI of the thoracic spine. There was no significant central canal stenosis. He was given a back brace for comfort and was ambulating well. At discharge, he was instructed to perform activities as tolerated, while avoiding any bending, stooping, or heavy lifting (Exhibit 3F). Thereafter, a February 22, 2012 MRI of the cervical spine showed no significant nerve compression or spinal cord compression, and he returned to Dr. Banks in April 2012 feeling much better. Notably, he continued to wear the back brace despite Dr. Banks recommending he wean off the brace. Neurological examinations continued to be completely normal, with no significant tenderness to palpation of his back and the motor, reflex, and sensory exams were normal. X-rays continued show a stable fracture without any changes. These findings are consistent with Dr. Mosley's progress note of July 16, 2012 indicating the claimant denied arthralgia, joint swelling and exhibited no abnormalities of gait (Exhibit 2F). In September 2012, Dr. Banks opined the claimant was at maximum medical improvement with regard to the thoracic spine fracture and released the claimant to return to work with medium duty restrictions (Exhibit 3F).

> As for the cervical spine, there were no significant findings on a September 2012 MRI. Although it showed cervical spondylotic disease at C5-6 and C6-7, there was "absolutely" no cord compression and no signal change, and Dr. Banks noted satisfactory range of motion of the neck (Exhibit 3F). Then in March 2013, a myelogram and CT of the cervical spine revealed evidence of bony osteophytic disease and disk herniation on left at C5-6 causing a C6 radiculopathy, and Dr. Banks recommended and then perform[ed] an ACDF on April 26, 2013

(Exhibit 3F). The claimant did well following the surgery, and May 2013 x-rays showed good alignment of the screws and hardware without evidence of complication. Dr. Banks recommended that he remain off work and return in 3 months (Exhibit 4F). In August 2013, Dr. Banks opined the claimant had reached maximum medical improvement from a cervical standpoint, [ ] and opined he should continue the restriction to the medium work category until it is readdressed by Dr. Ca1ter (sic) on the left shoulder (Exhibit 4F).

Regarding the claimant's shoulder pain, the claimant saw Dr. Cantrell in March 2013 when he was given an injection in the shoulder. At that time, Dr. Cantrell noted some degenerative changes, but there was no evidence of a rotator cuff tear (Exhibit IF). After the ACDF in April 2013, he continued to complain of shoulder pain even though Dr. Cantrell noted no swelling, deformity, or instability of the left shoulder with only slight limitation of internal rotation behind the back. However, the claimant underwent a left shoulder arthroscopy on June 25, 2013 and followed with some physical therapy. In August 2013, x-rays continued to show stabilization with no complicating factors or other obvious bony abnormalities identified (Exhibit 4F). He was progressing nicely and range of motion had improved with minimal discomfort. Dr. Cantrell released the claimant on September 16, 2013 (Exhibits 6F, 7F).

Thereafter, the claimant has been managed conservatively with medication and injections for hip and SI joint pain by Dr. Sovic and has done well. When last treated, June 19, 2014, he reported that his last block had helped, and he was the "Best he's felt in 2 yrs" (Exhibit 14F). His return visit on July 8, 2014, was only for a medication check, which suggests his symptoms were controlled with medication and were not especially troublesome (Exhibit 14F). He has also been followed by Dr. Mosley on three occasions, primarily for hypertension (Exhibit 13F). Dr. Mosley observed the claimant to be well developed/nourished in no acute distress and noted essentially normal examinations. At the most recent visit, April 9, 2014, the claimant complained of constant pain with decreased range of motion, yet there is no evidence of a musculoskeletal examination in the office notes (Exhibit 13F), which

would lead one to conclude the findings, if there were any, were insignificant or normal.

A July 18, 2014 MRI of the lumbar spine showed the old compression fractures and multilevel degenerative disk disease. MRI of the thoracic spine showed mild to moderate central canal stenosis in addition to the multilevel disk disease (Exhibit 17F). However, he has not returned to a physician, which suggests he is not experiencing any significant symptoms and limitations which would require medical treatment.

(R. 16-17).

In his challenge to the ALJ's determination, Chancy provides a detailed chronological summary of his medical history since the accident. (Doc. 17 at 13-30). When that rendition is compared with the ALJ's decision and the record, it is evident Chancy's medical history is complicated. Accordingly, the court will begin its review of the matter with a comprehensive review of Chancy's medical history.

Dr. Banks first saw Chancy at Huntsville Hospital shortly after the 18-wheeler accident. His notes reflect that Chancy's neck was "tender in the posterior midline around the C6-7 region" and his movement was limited because of back pain. (R. 291). Dr. Banks diagnosed Chancy with a T12 fracture compression. (R. 292). He saw Chancy about one month later on February 8, 2012, due to numbness and tingling in his left arm and "significant" pain in his back. (R. 244). Chancy was prescribed Norco 10 every four hours, along with Skelaxin. (R. 244). Chancy's February 13, 2012, MRI showed (1) post surgical changes related to a prior fusion at C6-7; (2)

moderate cervical degenerative change above and below the level of fusion at C5-6 and C7-T1 and main level cervical degenerative change; (3) borderline versus mild canal narrowing at C5-6 and C7-T1; (4) moderate left foraminal narrowing at C5-6 and moderate right foraminal narrowing at C7-T1, mild to moderate left foraminal narrowing suggested at C7-T1 and mild right foraminal narrowing suggested at C5-6; and (5) mild facet arthropathy at T1-2. (R. 273). There was no significant nerve or spinal cord compression specified. (*Id*.) During his February 20, 2012 visit with Dr. Banks, Chancy's self-reported symptoms included the following: fatigue, blurred or double vision, sleep apnea, nausea or vomiting, constipation, joint pain, joint stiffness or swelling, joint weakness, muscle pain or cramps, difficulty walking, headaches, dizziness, balance problems, numbness, memory loss or confusion, sleep problems, depression, pain in his left hip, falling three times from losing his balance, trouble sleeping, suicidal thoughts, and mood changes. (R. 248). After reviewing the MRI, Dr. Banks noted the following: "prior 6-7 fusion with adjacent level disease at C5 and C6, worse towards the left, and also some broad based disk bulging at C7 and T1, no significant nerve or spinal cord compression seen," and "numbness and tingling in [Chancy's] left arm could be related to the 5-6 disk herniation." (R. 243).

On Chancy's March 7, 2012 visit, Dr. Banks noted Chancy's continued complaints of pain in his left arm with numbness and tingling. Dr. Banks then noted

that the MRI revealed "adjacent level disease above his prior C6-C7 cervical fusion." (R. 242). He also noted that Chancy had "an area of palpable tenderness of his kyphotic deformity related to his fracture." (*Id*.) He further noted that Chancy was "able to ambulate with a walker and, overall, appears [to be] feeling better." (*Id*.) Dr. Banks prescribed Mobic, a Medrol Dosepak, pain medications, and muscle relaxers. (*Id*.)

During Chancy's April 9, 2012 visit with Dr. Banks concerning a follow-up for his "T11-12 burst fractures," Chancy reported experiencing pain. (R. 241). Dr. Banks noted that "[o]verall he appears that he is feeling much better." (*Id*.). Dr. Banks recommended that Chancy continue pain management. He also refilled Chancy's Norco #45 prescription. Finally, he noted that Chancy was experiencing gastritis and stomach pain caused by his medications. (*Id*.) He recommended that Chancy try to decrease his Mobic intake.

On May 21, 2012, Dr. Banks documented that Chancy was still suffering from back pain, as well as numbness and tingling in his left arm. (R. 240). Chancy denied "any significant pain or weakness in his legs." (*Id*.) Chancy reported that he was not able to ambulate outside "for more than five minutes without excruciating back pain." (*Id*.) However, Dr. Banks noted that Chancy was able to ambulate with a cane and that Chancy did not require a cane as he independently ambulated in the room during

the examination. (*Id*.) Dr. Banks also noted that Chancy could not bend forward without pain. (*Id*.) However, he further noted that Chancy was still wearing his brace "despite the fact that [he] recommended [Chancy] wean himself out of his brace the last time." (*Id*.) Dr. Banks's review of Chancy's x-rays showed "a stable fracture without any changes." (*Id*.) He felt Chancy might be close to his maximum medical improvement. (*Id*.)

On July 5, 2012, Chancy returned to see Dr. Banks, complaining of continued back pain despite taking Percocet 10 up to four times a day. Dr. Banks noted Chancy still had difficulty with range of motion and he was "minimally tender to palpation," but "his motor reflex and sensory examination was normal as it usually is." (R. 239). Dr. Banks also noted that he believed Chancy was "far enough out that he should start to get some relief." (*Id*.) He further stated that Chancy's "problems with his narcotics is related to his previous addiction and we will not be able to sustain this indefinitely." (*Id*.) Dr. Banks decided to "hold off on ... physical therapy and set him up with anesthesia for pain management injections." (*Id*.) He also provided Chancy with a Percocet prescription until he was able to see "anesthesia for pain management." (*Id*.)

Chancy began seeing Dr. Marion Sovic with Pain Management Services, P.C., on July 24, 2012. (R. 609). Chancy reported that a block performed by Dr. Banks did

not help and he "continued to have lower back pain both left and right-sided. He continue[d] to complain of middle back and also lower back pain, both left and right. He state[d] that any kind of bending or walking increases the pain, not much decreases the pain. He has been wearing a brace." (*Id*.) His medications at the time were Oxycodone, Norco, Protonix, and Atenolol. (*Id*.) According to Dr. Sovic, Chancy was "unable to flex and extend to any significant degree in his lower extremities." (*Id*.) Dr. Sovic prescribed 10 mg of Percocet and set up a block for his lower back with follow up in one month. (R. 610).

On August 14, 2012, Dr. Sovic noted that Chancy continued to complain about lumbar pain. (R. 413). Chancy stated that his pain was 7/10. Dr. Sovic continued him on Percocet, and added Ambien. (*Id*.) A musculo/skeletal examination showed "stiffness, back pain, and muscle weakness" and a neurologic exam showed "poor balance, headaches, numbness, and tingling." (*Id*.)

On September 8, 2012, following two blocks from Dr. Sovic, Chancy was still experiencing mid-thoracic and lower back pain. (R. 410). He continued to take Zanaflex, Ambien, and Percocet for the pain. By this visit, he was reporting pain at a level of 5/10. (*Id*.)

On September 24, 2012, Chancy returned to see Dr. Banks with complaints of "continued pain in his back." (R. 238). According to Chancy, the pain had increased

15

over the last three or four weeks.  Chancy reported that he could not walk to the mailbox without having to rest for an hour after trying.  Dr. Banks noted Chancy's range of motion was difficult in his back, but satisfactory in his neck.  After reviewing previous x-rays, Dr. Banks found Chancy's fracture to be stable.  The recent MRI of his cervical spine "shows cervical spondylitic disease at C5-6 and C6-7.  There is a fusion at C6-7.  To the right at C7-T-1, there is some bony osteophylic disease present, however, there is absolutely no core compression whatsoever and there is no signal change seen." (*Id*.)  Dr. Banks believed that surgery would not be of benefit to Chancy.  Dr. Banks set Chancy up for a functional capacity evaluation and impairment rating as to his back and neck.  Dr. Banks further recommended that Chancy follow up with Dr. Sovic for pain management.  (*Id*.)

On October 30, 2012, Dr. Sovic performed another block on Chancy because he was experiencing pain at a level of 7/10.[3]  (R. 578).

On November 5, 2012, Dr. Banks reported that Chancy's functional capacity evaluation "was potentially an invalid test and because of this I will release him back to work with medium duty restrictions."  (R. 237).

Chancy's January 22, 2013 MRI showed the following: (1) a prior cervical

---

[3]  On February 12, 2013, Chancy reported that the block did not give him any significant relief.  (R. 573).

fusion at C6-C7; (2) a diffuse disc bulge at C7-T1; (3) an old T12 compression fracture; and (4) a diffuse disc bulge at T11-T12. (R. 280). It was reviewed on February 12, 2013, by Dr. Sovic. It showed "an anular disc bulge causing essentially complete effacement of the CSF space above the cord at T11/12." (R. 573). Dr. Sovic discussed with Chancy the possibility of seeing a surgeon. (*Id*.)

During his next visit with Dr. Banks on February 20, 2013, Chancy presented with continued complaints of neck and lower back pain. Dr. Banks reviewed the MRI. He did not find it helpful due to a lack of clarity. He did state that Chancy was stable. (R. 236). Dr. Banks recommended further testing to determine whether Chancy had significant stenosis, including a myelogram and postmyelogram CT scan of the entire neural axis. (*Id*.)

Chancy presented to Dr. Banks on March 4, 2013, for a myelogram with complaints of "neck and shoulder pain, arm issues, and thoracic stenosis." (R. 261). Dr. Banks documented Chancy's medical history, including "T9, T10, T11, and T12 fractures, migraines, hypertension, heart disease, chronic fatigue." (*Id*.) Dr. Banks also noted that Chancy was still wearing his back brace and he reported that he was still experiencing considerable pain. (*Id*.) Chancy reported fatigue, blurred or double vision, sinus problems, heart trouble, sleep apnea, nausea/vomiting, diarrhea, constipation, joint pain, joint stiffness or swelling, joint weakness, muscle pain or

cramps, difficulty walking, memory loss, and sleep problems during a "review of systems." (*Id.*)

During a March 7, 2013 visit with Dr. Banks, Chancy complained of "pain in his neck and left shoulder into his left arm with some numbness in his index finger, but also includes the other fingers as well." (R. 235). Dr. Banks found that it was "difficult to elicit reflexes in his upper extremities" and Chancy felt "like he is somewhat weaker in his left leg secondary to some pain in his hip." (*Id.*) Dr. Banks also noted that a "[r]eview of his cervical myelogram and postmyelogram CT reveals evidence of bony osteophytic disease and possibly a disc herniation to the left at C5-C6. This is above his level of fusion that he has had at C6-C7. There is almost complete obliteration of the cervical nerve root on that side." (*Id.*) Dr. Banks continued, "I let him know that his back has healed as well as it is going to. I know he still has pain, although I do not feel that surgery is going to be of benefit to help relieve this at all. I feel that he is at maximum medical improvement with regard to his lumbar spine." (*Id.*) Dr. Banks recommended that, due to "a disc osteophyte complex to the left and possibly an acute disc herniation at C5-C6 causing a C6 radiopathy," Chancy undergo an anterior cervical discectomy and fusion from the right side. (*Id.*)

On March 12, 2013, Chancy went to see Dr. Sovic due to the significant pain

he was experiencing (8/10). Dr. Sovic recommended surgical evaluation for the "anular bulge causing some effacement of the CSF space at T11/12." (R. 571). She also confirmed that "surgically there is no surgery indicated for his thoracic region." (R. 572).

On March 19, 2013, Dr. Michael Cantrell saw Chancy for shoulder and hip pain. (R. 430). Chancy reported pain at a level of 9/10 in his shoulder and hip. (*Id.*) Dr. Cantrell documented Chancy's neurologic symptoms of tingling and numbness in his left hand. (*Id.*) Dr. Cantrell's impression was "left shoulder pain with AC joint arthrosis and possible rotator cuff tear" and "left hip pain, SI joint origin." (*Id.*) Dr. Cantrell thought the hip would be "better treated by another physician" and recommended beginning with treatment of the cervical spine to see if that helped the shoulder problem. (*Id.* at 430-31).

During an April 2, 2013 visit, Dr. Cantrell again recommended conservative management of Chancy's shoulder, but "once his cervical spine surgery is performed and he is recovered if his shoulder is persistently painful, we will consider surgical treatment with regards to the shoulder." (R. 428). Dr. Cantrell also referred Chancy to a physiatrist for hip and SI joint pain. (*Id.*)

On April 9, 2013, Chancy reported "shoulder, neck, and also upper extremity pain" at a level of 8/10. (R. 570). Dr. Sovic noted that "the patient has truly not

improved with blocks and has not improved with narcotics." (*Id*.)  She planned to wean him from the narcotics since they were not effective.  (*Id*.)

On April 26, 2013, Dr. Banks performed the anterior cervical discectomy and fusion from the right side procedure that he had recommended for Chancy.  (R. 252).

On May 20, 2013, Dr. Banks stated that Chancy could "remain off work" and that "he will meet maximal medical improvement upon his next visit."  (R. 368).  He also noted that there had been "no significant changes in his pain level."  (*Id*.)  Dr. Banks recommended Chancy go back to see Dr. Cantrell to see if any more could be done for his left shoulder pain.  (*Id*.)

On May 28, 2013, Chancy went to see Dr. Sovic as his pain level was 9/10.  (R. 569).  Dr. Sovic noted that Chancy had undergone three blocks since July 2012, which brought "some intermittent relief but not[hing] long-lasting."  (*Id*.)

On May 31, 2013, Dr. Cantrell noted that the cervical spine surgery had not improved the shoulder pain.  (R. 425).  Dr. Cantrell opined that surgery would "not resolve his upper left extremity pain with paresthesias," but would "likely help his discrete shoulder pain."  (*Id*.)

On June 25, 2013, Dr. Cantrell performed a "left shoulder arthroscopy, debride SLAP, debride rotator cuff, decompression, distal clavicle resection, and biceps tenodesis" on Chancy.  (R. 422, 435-36).  Physical therapy resulted in multiple

reports that Chancy's pain limited his ability to regain strength and range of motion. (R. 443-46, 461-62). On August 1, 2013, Chancy reported that he had "all the time pain" in his left shoulder and arm that caused him to be unable to sleep. Activities made the pain worse. (R. 492).

During an August 5, 2013 visit, Dr. Banks noted "tenderness over [Chancy's] left sacroiliac joint." (R. 366). He also noted that Chancy had "difficulty flexing his left hip due to sacroiliac joint pain and complains that his back pain has become more severe." (*Id*.) He further noted that Chancy's "upper left extremity function is immobilized but he can grip and extend his hand. He has numbness in a nondermatomal distribution but his biceps, triceps, and deltoid strength was not assessed secondary to shoulder immobilization." (*Id*.) Chancy's recent x-rays showed that his hardware at the C5-6 region appeared to be stable and there was no evidence of complications or "other obvious bony abnormalities." (*Id*.) Dr. Banks's impressions were "sacroiliac joint syndrome," "T12 burst fracture treated expectantly and at maximum medical improvement," and "cervical radiculopathy status post anterior cervical discectomy and fusion at C5-6." (*Id*.) Dr. Banks stated that Chancy should continue his shoulder therapy with Dr. Cantrell. Dr. Banks concluded that he did not need to see Chancy again from a "cervical standpoint" because "[h]e has reached maximum medical improvement at this time." (*Id*.)

On August 13, 2013, Dr. Sovic noted that Chancy continued to be on Tylenol No. 3, Zanaflex, and Ambien. (R. 404). Chancy's pain level was 6/10. (*Id*.) Dr. Sovic's musculoskeletal examination showed "some joint pain, stiffness and back pain, muscles aches and loss of strength" and her neurologic examination showed "poor balance, numbness, and tingling." (*Id*.) Dr. Sovic's assessment was "thoracic pain and also left SI joint pain." (*Id*.)

On August 27, 2013, Chancy reported to his therapist that his shoulder pain interfered with normal activities and that he was unable to do work or other daily activities because of his shoulder. He had "severe" pain and tingling, and there was so much pain in his shoulder that he could not sleep. (R. 455). His worst pain that week had been 10/10. (R. 456).

On September 16, 2013, Chancy had a follow-up visit with Dr. Cantrell. The notes from that visit show that Chancy stated that he was progressing nicely. His shoulder was much better than before the surgery. (R. 422). Chancy also completed his physical therapy for the shoulder on September 20, 2013. (R. 440).

Dr. Brian Carter completed a Functional Capacity Evaluation ("FCE") on Chancy on September 27, 2013. It "included a thorough examination and review of the treatment records and included the lumbar/cervical impairments as well as the shoulder." (R. 18). The ALJ summarized the findings as follows:

During the examination, Dr. Carter noted only mild tenderness across the cervical paraspinal and trapezial area, Spurling's maneuver was negative, and some slight range of motion deficits in all planes including cervical rotation. However, range of motion of the thoracic and lumbar spine was normal, straight leg raising test was negative, femoral stretch was negative, the sacroiliac joints and PSIS were nontender to palpation, and hamstrings were normal in tone. Faberge test was negative and the hips were nontender to internal and external rotation. There was no myofascial pain and no active trigger points. Examination of the left shoulder revealed some mild tenderness across the AC joint and biceps tendon insertion. There was some reduced range of motion, which Dr. Carter opined translated to a total left upper extremity impairment of 9% and a whole person impairment of 5%, and a 10% whole person impairment for the cervical spine. He further opined when combined with the prior impairment rating, the claimant would have a total whole person impairment of 28%. Dr. Carter stated that based on testing the claimant would be limited to sedentary physical demand over an 8-hour day; however, the claimant exhibited moderate symptom/disability exaggeration by the testing criteria. Testing further suggested only fair effort that could be considered consistently self-limiting (Exhibit 8F).

(R. 18 (citing R. 507-10)). The court also notes that during Dr. Carter's evaluation, Chancy reported "he is just doing fairly miserable overall. He notes constant neck and shoulder pain as well as mid-back and hip area pain." (R. 507).

On December 7, 2013, Alabama Disability Determination Services consultant Dr. Annie L. Harris examined Chancy in Cullman, Alabama. She found, in pertinent part, that Chancy suffers from "[s]evere low back pain ... [s]econdary to spinal fractures for [an] 18 wheeler accident." (R. 519). "His [pain] is severe and worsened with essentially any movement except lying down with cushions. Pain is also in left

hip which occasionally causes him to fall when his leg 'gives out.'" (*Id*.)  Dr. Harris

also noted that his lumbar spine and hip range of motion ("ROM") "was incompletely

assessed." (*Id*.)  She did state, however, that he had normal range of motion in all

joints with the following exceptions:

1.  Decreased forward shoulder evaluation (130 bilaterally).  Otherwise, bilateral ROM was normal.

2.  Decreased cervical spine flexion (35).  Otherwise, cervical spine ROM was normal.

3.  Lumbar forward and lateral flexion were unable to be assessed because the patient refused secondary to back pain.

4.   Decreased hip flexion (right 80, left 70).  Hip internal rotation was unable to be assessed secondary to pain.  Hip external rotation and abduction were normal bilaterally.

5.  Knee flexion was decreased on the right (100) but normal on the left.

6.  Supine and straight leg raise tests were not obtained because patient would not lie flat or sit in proper positioning.

(*Id*.)  Dr. Harris also stated that Chancy had "[d]ecreased muscle strength ... from

paint with movements.  No atrophy...." (*Id*.)  In the physical examination portion of

her evaluation, she stated that Chancy "was able to ambulate with mild difficulty.  He

was able to get on and off the exam table as well as up and out of the chair with mild

difficulty." (R. 518).  When evaluating his spine and extremities, she stated Chancy's

gait was slow and he favored his right leg "secondary to left hip pain." (R. 519).  She

also noted that he still used his cane, his walking heel-to-toe was normal, and his walking on his toes and heels was poor secondary to his left hip pain. (*Id*.)

On January 8, 2014, Dr. Robert Estock, a state agency medical consultant, conducted a residual functional capacity evaluation. He found that Chancy could perform light work, except that he could only occasionally balance, stoop, kneel, crouch, crawl, and climb ramps or stairs, and he could not climb ropes, ladders or scaffolds. Additionally, he found hat Chancy could occasionally perform overhead reaching with his right arm, but could not overhead reach with his left arm. (R. 64).

On January 21, 2014, Chancy returned to see Dr. Sovic to discuss a "repeat block." (R. 542). Dr. Sovic's notes record that Chancy stated that he was doing well on his medicines that included Ambien, Tylenol #3 and Zanaflex. (*Id*.) Dr. Sovic continued Chancy on his medications and informed him that he could have a block in the future if it was necessary. (*Id*.) Dr. Sovic scheduled Chancy for a follow-up visit in three months.

Chancy returned to see Dr. Sovic on February 20, 2014, for another lumbar epidural block. (R. 544-48). It was administered that same day.

An April 15, 2014 visit with Dr. Sovic evidenced continued low back and left hip pain. (R. 540). Dr. Sovic assessed that Chancy was experiencing "lumbago," "pain of thoracic spine," and "disorders of sacrum." (*Id*.)

On June 19, 2014, Chancy went to Dr. Sovic for another block. During his pre-procedure assessment, he reported that the last block had helped for "11 days" and he felt the "[b]est he had in the last two years." (R. 533). Another block was administered that day. (R. 533-39).

Chancy returned to see Dr. Sovic on July 8, 2014, for a medicine check. Dr. Sovic again noted muscle aches, lumbar spine pain, and joint pain and swelling. (R. 531). Chancy was continued on his medications and scheduled for a follow-up visit in three months. (R. 532). Dr. Sovic also requested lumbar spine and thoracic spine MRIs, which were conducted on July 18, 2014. The lumbar spine report states that the MRI showed "old compression fractures at T11 and T12 levels" that "compresses the underlying cord" causing "mild to moderate central canal stenosis," "shallow broad-based disc bulge with left paracentral annular rent" at L1-L2; "Schmorl's node defects along the inferior aspect of L2 and superior aspect of L3"; "broad-based disc bulge" and "mild central canal and bilateral recess stenosis" at L3-L4; "foraminal disc bulges" producing "mild central canal and bilateral lateral recess and foraminal stenosis" at L4-L5; and a "shallow disc bulge" at L5-S1; leading to an overall impression of "old T11 and T12 compression fractures" and "multilevel disc disease as described." (R. 634). The thoracic spine report states that the MRI showed a "small central disc herniation" at T7-T8; "Schmorl's node defect" at T9-T10;

"compression deformity of the superior end plate of T11"; and "degenerative disc disease at the T12 level"; leading to an overall impression of "old appearing compression fractures involving T11 and 12 as described," "retropulsion and posterior osteophyte formation at the T11 level which produces mild to moderate central canal stenosis and abuts the underlying cord," and "multilevel disc disease as described." (R. 635).

Dr. Mosley first saw Chancy on July 16, 2012. Chancy was diagnosed with lymphadenopathy, hyperlipidemia, hypertension and vertebral fracture. (R. 220). During the examination, Dr. Mosley noted Chancy was using a back brace for support. (*Id*.) After examining his CT scan, Dr. Mosley scheduled Chancy for a follow-up visit in six months. (*Id*.)

Dr. Mosley saw Chancy on April 16, 2013. Chancy's chief complaint was low back pain. Dr. Mosley noted that Chancy's neck injury was causing him arm pain and numbness in his left arm. (R. 221). The records reveal nothing further.

Chancy was seen by Dr. Mosley on October 3, 2013, for a complaint of high blood pressure associated with chronic pain. (R. 525). Dr. Mosley continued Chancy on his medications and scheduled him for a return visit in four months. (R. 526).

On April 9, 2014, Dr. Mosley treated Chancy for "aching," "stabbing," "severe," "all day" back pain "from [his] scapula down to lumbar spine" as well as

severe nausea. (R. 522). Dr. Mosley continued Chancy's medications and scheduled him for a return visit in four months. (R. 524).

On August 26, 2014, Dr. Mosley provided sworn testimony explaining the benefits a regular-treating physician has over a one-time examiner in evaluating a patient. Specifically, he states that a treating physician is "able to see over a period of time what effect the patient's illness is having upon their general health, their ability to perform their daily tasks, their work, etc." (R. 618). He further states that this allows the physician to form an opinion about whether or not a patient is a malingerer. (*Id*.)

As to Chancy, Dr. Mosley testifies that his medical history was complicated. (R. 620). He further states that Chancy was not a malingerer. He consistently followed all Dr. Mosley's medical advice. (R. 625). Dr. Mosley states that Chancy's problems were "not something he will overcome." (R. 626). Dr. Mosley "suspect[s] he will be left with chronic pain and impairment and not be able to function because of it." (*Id*.)

Dr. Mosley also completed a Functional Capacity Assessment ("FCA")form concerning Chancy. (R. 621 & 630-32). On the assessment form, Dr. Mosley states as follows:

> (1) During an 8-hour workday, Chancy could only sit

continuously for two hours and stand or walk continuously without a break for one hour (R. 631);

      (2)  As a result of his impairments, Chancy would need to lie down for approximately three hours to rest or alleviate pain (*Id*.);

      (3)  Considering the impact of the combination of his impairments, Chancy could be expected to miss 100 days of work over the course of a year even in the best of circumstances.

(R. 632). He also concludes that Chancy could not make it through a full eight-hour workday five days a week. (R. 623). Dr. Mosley states that his findings are based on objective information and other diagnostic testing that was performed on Chancy. (R. 621-22). Lastly, Dr. Mosley states that Chancy's reports (that his pain level was a 7/10 or 8/10 despite medication, that he could not sit, stand, or walk for more than ten or fifteen minutes at a time, that he has to lie down for at least three hours of the day, and that his sleep was poor) were consistent with the history Chancy had given. (R. 623).

### 3.    Analysis

#### a.    Deference as a Treating Physician

As enumerated above, Chancy presents three challenges to the findings of the ALJ concerning Dr. Mosley. The first asserts that the ALJ did not accord proper weight to Dr. Mosley's "extensive involvement" with Chancy as a treating physician. (Doc. 17 at 34). He argues that "Dr. Mosley offers exactly what the regulation and

case law require – a 'detailed, longitudinal picture' of Mr. Chancy's medical impairments and a 'unique perspective' of his entire medical background."[4] (*Id*.) The Commissioner responds that the ALJ demonstrated good cause for giving little weight to Dr. Mosley's opinions on Chancy's RFC because his opinions were inconsistent with the other medical evidence and his treatment notes. (Doc. 18 at 7). The Commissioner further states that "Dr. Mosley's assessment was based on only two office visits, October 3, 2013, and April 9, 2014, some four months prior to the date he completed the assessment." (Doc. 18 at 7).

In assessing the ALJ's decision to give little weight to Dr. Mosley's opinions and sworn statement, the court first notes that the ALJ incorrectly challenged Dr. Mosley's sworn statement that he (Dr. Mosley) based his assessment on his "4 or 5 visits" with Chancy. Specifically, the ALJ stated that Dr. Mosley "only saw the claimant on two occasions." (R. 18). The ALJ is incorrect. Dr. Mosley saw Chancy four times – July 16, 2012, April 18, 2013, October 3, 2013, and April 9, 2014 – prior

---

[4]The Social Security regulations provide:

Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultive examinations or brief hospitalizations.

20 C.F.R. § 404.1527(d)(2).

to providing his sworn testimony. This is significant because the ALJ further notes that the visits were a mere four months before Dr. Mosley completed the functional capacity assessment. In reality, Dr. Mosley had been Chancy's treating physician for over two years. This, therefore, tends to support, not detract from, the significance of his opinions and sworn testimony. Additionally, the ALJ does not appear to have considered the fact that Dr. Mosley was provided with certain medical records from Chancy's other treating physicians. (*See* R. 371-78). Still further, Dr. Mosley stated in his testimony that he was aware of Chancy's diagnostic testing. (R. 621).[5] Thus, the court finds that as to this first aspect of the claim, the ALJ's reasoning is not sufficient to support a determination that good cause exists to accord little weight to Dr. Mosley's opinions and statements. That, however, is not the end of the consideration. The court must examine the other evidence in the record as well.

### b.    Other Evidence in the Record

Chancy next asserts that the other evidence in the record supports Dr. Mosley's opinions. (Doc. 17 at 36). Chancy argues that the records of Dr. Banks and Dr. Sovic "document their ongoing and losing battle with treating [] Chancy's back, hip, shoulder, and arm pain." (Doc. 17 at 36). Additionally, he states that the opinions of Drs. Harris and Carter do not support a contrary finding. (*Id*. at 36-37). The

---

[5]The record does not reveal, however, the extent of that knowledge. (*See* R. 621).

Commissioner does not address these specific evidentiary contentions. Instead, she argues that "considering the record in its totality, the ALJ properly rejected Dr. Mosley's opinions and afforded great weight to the opinion of the state agency consultant, Dr. Estock." (Doc. 18 at 8 (citing R. 16-19)).

With regard to Dr. Banks, the ALJ gave his opinion "some weight" because Dr. Banks "consistently indicated the claimant could perform medium duty work." (R. 18). The ALJ further noted, however, that his opinion could not be given great weight because it was limited to Chancy's back and neck impairments without consideration of his left upper extremity impairment. (*Id*.) In reviewing the record, the court cannot find that Dr. Banks "consistently indicated the claimant could perform medium duty work." (R. 18).

While Dr. Banks on November 5, 2012, did release Chancy to "work with medium duty restrictions" following a "potentially" invalid FCE test (R. 237), neither the ALJ nor the Commissioner cites to any other reference by Dr. Banks stating that Chancy could work with medium duty restrictions. To the contrary, the court notes that the ALJ's opinion does not discuss or reference the impact of Chancy's March 2013 complaints of pain, his subsequent April 2013 surgery, or Dr. Banks's subsequent statement on May 20, 2013, that Chancy could "remain off work" and he "will meet maximal medical improvement upon his next visit." (R. 368). During the

May 20 visit, Dr. Banks also stated there had been "no significant changes in [Chancy's] pain level." (*Id*.) Additionally, it appears that on August 5, 2013, when Dr. Banks concluded that Chancy "reached maximum medical improvement at this time," Chancy was still under direction from Dr. Banks that he could "remain off work." Thus, this evidence is contrary to the determination of the ALJ.

With regard to Dr. Sovic, the ALJ stated that Dr. Sovic conservatively managed Chancy's conditions with medication and injections. (R. 17). The ALJ also stated that Chancy had done well, citing to his statements on June 19, 2014, that the last block had helped and he was feeling better than he had in the last two years. (*Id*.) Additionally, the ALJ noted that this evidence "contrasts" with Dr. Mosley's statement that Chancy "could not complete an 8-hour workday, 5 days a week and would miss 100 days per year." (R. 18).

The foregoing references to Dr. Sovic present a very myopic view of the overall evidence provided by Dr. Sovic. They do not account for the following additional observations by Dr. Sovic: (1) a July 24, 2012 finding that Chancy "was unable to flex and extend to any significant degree;" (2) frequent musculoskeletal exams showing stiffness, back pain, muscle weakness or loss of strength (*see* August 14, 2012 (R. 599), September 18, 2012 (R. 589), February 12, 2013 (R.573), May 28, 2013 (R. 569), August 13, 2013 (R. 553), July 8, 2014 (R. 531)); and (3) frequent

neurological exams showing poor balance, headaches, numbness, tingling or difficulty with concentration (*see* August 14, 2012 (R. 599), September 18, 2012 (R. 589), February 12, 2013 (R. 573), March 12, 2013 (R. 571), May 28, 2013 (R. 569), August13, 2013 (R. 553)).  Thus, the court does not find the ALJ's limited references to Dr. Sovic to be sufficient to support a finding that there is good cause to reject the opinions and testimony offered by Dr. Mosley.  This is particularly true in this case where there is no consideration of the foregoing contrary evidence.

Chancy also argues that the evidence and opinions of Drs. Harris and Carter do not support a finding of good cause to afford little weight to Dr. Mosley's opinions.  Concerning Dr. Harris, Chancy argues that her examination confirms that he has difficulties that cause limitations.  (Doc. 17 at 36-37).

The ALJ's only reference to Dr. Harris provides that she "did not offer an opinion other than the claimant's reported symptoms/limitations."  (R. 19).  This court recognizes that the regulations are clear that a plaintiff's own "statements alone are not enough to establish that there is a physical or mental impairment."  20 C.F.R. § 404.1528(a).  However, Dr. Harris did more that simply recite Chancy's reports and statements.  She made her own observations as well.  For instance, she stated Chancy had decreased muscle strength with movement due to pain; he had no atrophy; he was able to ambulate with mild difficulty; he was able to get on and off the exam table as

well as up and out of the chair with mild difficulty; his gait was slow; he favored his right leg due to pain; and his walking heel-to-toe was normal while his walking on his toes and heels was poor due to his hip pain. (R. 518-19).

Concerning Dr. Carter's September 2013 FCE, Chancy argues that it shows that he tested at a sedentary physical demand level and that he had a "a total whole person impairment rating based on his cervical spine and left shoulder impairments combined with a previously assigned rating for the T12 compression fracture alone." (Doc.17 at 37 (citing R. 509)). While this evidence might tend to support his claim, Chancy ignores the remainder of Dr. Carter's assessment which also provides that Chancy exhibited moderate symptom/disability exaggeration by the testing criteria and the testing data suggested only fair effort that could be considered consistently self-limiting. (R. 510). The ALJ considered the entirety of Dr. Carter's FCE. The court finds no error in that analysis.

### c.    Dr. Mosley's Opinions

Chancy next argues that the ALJ erred in not affording substantial weight to Dr. Mosley's opinions because those opinions are not conclusory or inconsistent with his records. (Doc. 17 at 37-44). In affording little weight to the statements and opinions of Dr. Mosley, the ALJ found that his statements and opinions were "not consistent with his own treatment notes." (R. 17). Specifically, she stated:

As for the opinion evidence, little weight is given to the sworn statement and opinion of the treating physician, Dr. Mosley, because they are not supported by the medical record. 96-20p states that a treating physician's medical opinion is entitled to substantial weight only when it is supported by substantial medical evidence and is not inconsistent with other substantial evidence. In this case, Dr. Mosley's statements and opinion are not only inconsistent with the objective medical record, but are also not consistent with his own treatment notes. His sworn statement indicates he formulated the assessment based on his treatment consisting of about 4 or 5 visits when in reality, he only saw the claimant on two occasions, October 3, 2013 and April 9, 2014, which was 4 months prior to completing the assessment. Furthermore, treatment consists primarily of medication for hypertension. His treatment notes describe the claimant as a well-developed/nourished individual in no acute distress with physical examinations being unremarkable for any significant findings. Yet he opined in the assessment that the claimant could not complete an 8-hour workday, 5 days a week and would miss 100 days per year. Moreover, this contrasts what he told Dr. Sovic on June 19, 2014, "Best he's felt in 2 yrs" (Exhibit 14F), and he has never told Dr. Sovic, who is the treating pain specialist, that he must lie down several hours a day (Exhibits 15F, 16F). Dr. Mosley (sic) apparently relied heavily on the subjective report of symptoms and limitations provided by the claimant. Yet, as noted by Dr. Banks and Dr. Carter, these exists good reasons for questioning the reliability of the claimant's subjective complaints.

(R. 17-18).

The court has already addressed the discrepancies concerning the number of visits with Dr. Mosley. Therefore, the only remaining reference by the ALJ to Dr. Mosley's "own treatment notes" is the fact that Dr. Mosley described Chancy "as a well-developed/nourish individual in no acute distress with physical examinations being unremarkable for any significant findings." (R. 18). The ALJ then states:

The undersigned is cognizant that the relationship between a patient and a treating physician is a special one, where the physician's desire is to relieve the patient's symptoms as they are described to him by his patient. His "opinions" which were solicited by the claimant and his representative were more subjective, or as one medical expert eloquently put it, "the treating physician speaks from the heart" when acquiescing to his patient's requests. His treating notes, however, are presumed to be a contemporaneous documentation of both the subjective statements of the patient, and of the objective findings and test results obtained by the physician. When both forms of communication are present, weight must be given to the latter as being the true evaluation of the claimant's condition.

The possibility always exists that a doctor may express an opinion in an effort to assist a patient with whom he or she sympathizes for one reason or another. Another reality which should be mentioned is that patients can be quite insistent and demanding in seeking supportive notes or reports from their physicians, who might provide such a note in order to satisfy their patients' requests and avoid unnecessary doctor patient tension. While it is difficult to confirm the presence of such motives, they are more likely in situations where the opinion in question departs substantially from the rest of the evidence of record, as in the current case.

(R. 18). Chancy argues that this analysis is a "severely flawed attempt at finding 'good cause'" and that Dr. Mosley's opinions are consistent with the remainder of the record. (Doc. 17 at 39).

Much of the first paragraph is superfluous and, therefore, is due to be ignored. That is not possible, however, because the ALJ correlates these general statements to the specific evidence in this case. To the extent the ALJ's discussion in the first paragraph explains her reliance on the contemporaneous notes, that is an appropriate

analysis. However, the analysis fails to discuss or account for Dr. Mosley's April 16, 2013 note that Chancy's neck injury was causing him arm pain and numbness in his left arm; his October 3, 2013 note that Chancy complained of high blood pressure, which Dr. Mosley associated with chronic pain; and his April 9, 2014 note that he treated Chancy for "aching," "stabbing," "severe," "all day" back pain "from [his] scapula down to [his] lumbar spine" as well as severe nausea. (R. 221, 522 & 525). Accordingly, it appears the ALJ did not adequately assess this evidence.

With regard to the second paragraph, Chancy argues that the ALJ is accusing Dr. Mosley of "unethically lying about and supporting Mr. Chancy." (Doc. 17 at 41). While this may be an overstatement, the court is troubled by much of the discussion in that paragraph. A large part of the initial discussion and general statements contained therein is conjecture and conclusions not supported by any evidence in the record. To the extent the ALJ rejects Dr. Mosley's statements and opinions premised on deviations between those opinions and "the rest of the evidence of record," that is appropriate (to the extent they are correct). However, to the extent the ALJ appears to ascribe improper motives to Dr. Mosley, that is not substantiated. For instance, there is no indication in the record that his opinions are motivated by a desire to "assist" Chancy, that Dr. Mosley "sympathizes" with Chancy, or that he provided the statements and opinions to satisfy Chancy's "requests and avoid unnecessary doctor

patient tension." (R. 18).

Premised on the whole of the deficiencies noted above, the court finds that the ALJ did not properly evaluate the evidence in this case. That error requires that this case be remanded for further proceedings and further evaluation consistent with this opinion.

## B.     Evaluation of Chancy's Credibility

Chancy next alleges that the ALJ failed to appropriately evaluate his credibility. (Doc. 17 at 44-52). The Commissioner responds that the ALJ properly evaluated Chancy's subjective testimony of disabling symptoms. (Doc. 18 at 8-15).

"[C]redibility determinations are the province of the ALJ." *Moore v. Barnhart*, 405 F.3d 1208, 1212 (11th Cir. 2005). When a claimant alleges disability through subjective complaints of pain or other symptoms, the ALJ must (1) determine whether the claimant established an impairment that could reasonably be expected to produce the pain or other symptoms alleged and (2) must analyze the intensity and persistence of the claimant's symptoms to determine the extent such symptoms limit the claimant's capacity to work. *See* 20 C.F.R. § 404.1529(b), (c); Social Security Ruling (SSR) 96-7p, 1996 WL 374186, at *1 (July 2, 1996); *see also Wilson v. Barnhart*, 284 F.3d 1219, 1225-26 (11th Cir. 2002) (finding ALJ applied the Eleventh Circuit pain standard where ALJ applied the Commissioner's regulations at 20 C.F.R. §

404.1529).  After considering a claimant's subjective complaints, the "ALJ may reject them as not creditable, and that determination will be reviewed for substantial evidence." *Marbury v. Sullivan*, 957 F.2d 837, 839 (11th Cir. 1992).  In determining credibility, the ALJ should consider any relevant evidence in the case record, including the objective medical evidence, the individual's own statements, inconsistencies in the evidence, and evidence provided by treating or examining physicians.  *See* 20 C.F.R. § 404.1529(c)(4); SSR 96-7p, 1996 WL 374186, at *1.  In evaluating the evidence, "[i]t is not enough [for the ALJ] to discover a piece of evidence which supports that decision, but to disregard other contrary evidence.  The review must take into account and evaluate the record as a whole."  *McCruter v. Bowen*, 791 F.2d 1544, 1548 (11th Cir. 1986).  This court will not disturb an "articulated credibility finding supported by substantial evidence."  *Mitchell v. Comm'r of Soc. Sec.*, 771 F.3d 780, 782 (11th Cir. 2014) (citing *Foote v. Chater*, 67 F.3d 1553, 1562 (11th Cir. 1995)); *see also* 20 C.F.R. § 404.1529(c)(4); SSR 96-7p, 1996 WL 374186, at *1.

Because the court finds it appropriate that this case be remanded to the ALJ, it will pretermit any discussion concerning the ALJ's credibility assessment of Chancy.  On remand, the ALJ will be required to further evaluate all of the evidence, which will require a reassessment of Chancy's credibility.

40

## C.    Bias

Lastly, Chancy argues that the ALJ showed a "clear bias against claimants who do not present as she desires, as well as a clear bias against treating physicians in general and Dr. Mosley in particular despite a complete lack of any evidence to support her speculation about Dr. Mosley's alleged 'motives.'"  (Doc. 14 at 53-57). The Commissioner responds that Chancy has failed to demonstrate bias.  (Doc. 18 at 15-18).  The court agrees with the Commissioner.

To be disqualifying, the alleged bias "must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case."  *United States v. Grinnell Corp.*, 384 U.S. 563, 583 (1966). Judicial rulings, routine trial administration efforts, and ordinary admonishments (whether or not legally supportable), which neither rely upon knowledge acquired outside the course of judicial proceedings nor display such deep-seated and unequivocal antagonism as to render fair judgment impossible, are not grounds for disqualification.  *See Liteky v. United States*, 510 U.S. 540, 556 (1994).  Opinions formed on the basis of facts or events arising during the current or prior proceedings are not grounds for a recusal motion unless they display deep seated favoritism or antagonism.  *See id*. at 555.

Chancy reiterates his disagreement with the ALJ's decision to afford little

weight to Dr. Mosley's statements and opinions to support this claim. (Doc. 14 at 53-57). However, unfavorable determinations alone are insufficient to demonstrate bias. The fact that this court believes the record warrants a remand is also insufficient to support a finding of bias.

To the extent Chancy cites to the two paragraphs in the ALJ's decision wherein she discussed her view of the "special" relationship between a patient and a treating physician and the general impact of such in support of his contention of bias, the court is not impressed. (Doc. 17 at 53-54). Contrary to Chancy's protestations, the ALJ did not accuse Dr. Mosley of violating medical ethics or attempting to defraud the Social Security Administration. As noted by the Commissioner, such statements are not foreign to decisions involving disability claims. (*See* Doc. 18 at 17 (citing *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001) ("We must keep in mind the biases that a treating physician may bring to the disability evaluation. The patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability." (quotations omitted)); *Brown v. Apfel*, 192 F.3d 492, 500 (5th Cir. 1999) (finding no ALJ bias when the ALJ stated that the claimant's physician was apparently "attempting to help the claimant get benefits")). The discussion does not evidence bias that would warrant the ALJ's removal.

To the extent Chancy argues that the ALJ "has one of the lowest approval rates," this is not evidence of bias and warrants no further discussion. (Doc. 14 at 53, n.7).[6]

## VI.  CONCLUSION

Premised on the foregoing, the court finds that this case is due to be remanded to the ALJ for further proceedings consistent with the determinations herein.  A separate order will be entered.

**DONE**, this the 18th day of January, 2018.

_John E. Ott_

_____
**JOHN E. OTT**
Chief United States Magistrate Judge

---

[6]Dr. Mosley submitted an affidavit in this action in response to the statements of the ALJ in her opinion. (*See* Doc. 17-1).  He states that he was asked to comment on the ALJ's statements.  Because this court's review typically is limited to the certified administrative record, this evidence may be considered only to determine if remand is warranted under sentence six of 42 U.S.C. § 405(g).  *See Ingram*, 496 F.3d at 1267-68; *Caulder v. Bowen*, 791 F.2d 872, 876 (11th Cir. 1986).  The Commissioner argues that Chancy has waived this argument because he has failed to show, or even argue, that this affidavit is new evidence warranting remand.  (Doc. 18 at 17, n. 17 (citing *See* Doc. 17 at 53-57 and *Outlaw v. Barnhart*, No. 05-15996, 2006 WL 2640223, at *2 n.3 (11th Cir. Aug. 10, 2006); *see also N.L.R.B. v. McClain of Georgia, Inc.*, 138 F.3d 1418, 1422 (11th Cir. 1998) ("Issues raised in a perfunctory manner, without supporting arguments and citation to authorities, are generally deemed to be waived.")).  Additionally, Chancy did not address this argument in his reply brief.  (*See* Doc. 19).